**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CONSTANTINE FRANTZIDES, M.D., Ph.D., an individual, and CHICAGO Institute of Minimally Invasive Surgery, LTD., | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) No. 08 C 6705<br>) |
| NORTHSHORE UNIVERSITY HEALTHSYSTEM FACULTY PRACTICE ASSOCIATES, INC., an Illinois not-for-profit corporation, NORTHSHORE UNIVERSITY HEALTHSYSTEM, an Illinois not-for-profit corporation, MARK TALAMONTI, M.D., and ILLINOIS COLLECTION SERVICE, INC., an Illinois corporation, | ) Judge Rebecca R. Pallmeyer<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Dr. Constantine Frantzides, M.D., Ph.D, and the Chicago Institute of Minimally Invasive Surgery ("Plaintiffs"), bring five claims against Defendants Northshore University HealthSystem Faculty Practice Associates, Inc., Northshore University Healthsystem, Dr. Mark Talamonti, M.D., and Illinois Collection Service, Inc. (collectively, "Defendants"). Plaintiffs' Amended Complaint alleges that Defendants violated the Sherman Act's prohibition on contracts or conspiracies in restraint of trade, 15 U.S.C. § 1 (Count I), and the Act's prohibition of monopolization, 15 U.S.C. § 2 (Count II). Plaintiffs further allege several state-law claims: intentional interference with prospective economic advantage (Count II), conspiracy (Count IV), and a violation of the Illinois Right of Publicity Act, 765 ILCS 1075/1 (Count V). Defendants now move to dismiss Plaintiffs' complaint on all counts. For the following reasons, Defendants' motion is granted, and the complaint is dismissed without prejudice.

**FACTUAL BACKGROUND**

The following facts are presented in Plaintiffs' Amended Complaint and recounted in the light most favorable to Plaintiffs. *Disability Rights Wisc., Inc. v. Walworth County Bd. of Supervisors*, 522 F.3d 796, 799 (7th Cir. 2008).

**I.     The Parties**

Defendant Northshore University Healthsystem, Inc. ("NUH"), formerly known as Evanston Northwestern Healthcare Corporation ("ENH"), is a hospital located in Evanston, Illinois. (Am. Compl. ¶ 6.) Defendant Northshore University HealthSystem Faculty Practice Associates, Inc. ("Faculty Practice"), formerly known as ENH Faculty Practice Associates, is an Illinois subsidiary of NUH, made up of 500 primary and specialty care physicians practicing in the northern suburbs of Chicago. (Am. Compl. ¶ 5.) Defendant Mark Talamonti is a Faculty Practice physician and has served as Chairman of the Department of Surgery at NUH since July 1, 2007. (*Id.* ¶ 7.) The final Defendant, Illinois Collection Service, Inc. ("ICS") is an Illinois collections agency. (*Id.* ¶ 8.)

Dr. Constantine Frantzides is a well-known laparoscopic surgeon and currently a professor of surgery at the University of Illinois in Chicago. (*Id.* ¶ 3.) The Chicago Institute of Minimally Invasive Surgery ("CIMIS") is a medical clinic located in Skokie, Illinois. (*Id.* ¶ 4.) Dr. Frantzides formed CIMIS in 2006 and now serves as its Director.[1] Prior to 2006, Dr. Frantzides was associated with Defendants NUH and Faculty Practice. This dispute arises out of events that occurred after Dr. Frantzides and the Defendant practice groups parted ways.

**II.     Events Following the Parties' Termination Agreement**

In the fall of 2003, NUH recruited Dr. Frantzides to join Faculty Practice, and he was named NUH's Director of Minimally Invasive Surgery. (*Id.* ¶¶ 17-18.) Three years later, in September

---

[1]     *See* CIMIS, http://www.laparoscopicexperts.com/our_team.html (last visited Mar. 30, 2011).

2006, Dr. Frantzides negotiated an Employment Termination Agreement with Faculty Practice.[2] (*Id.* ¶ 20.) By the terms of the agreement, Dr. Frantzides retained surgical privileges at NUH and agreed to use his "reasonable best efforts to assist [NUH] and Faculty Practice with collections of any accounts receivable arising from or related to services he performed while employed by Faculty Practice . . . ." (*Id.* ¶ 21.) Dr. Frantzides alleges that following the execution of the Termination Agreement, NUH and Faculty Practice launched a "continuous and systematic" campaign to damage his ability to compete in the laparoscopic surgery services market. (*Id.* ¶ 23.) Plaintiffs specifically allege that NUH and Faculty Practice: (1) misrepresented to patients that Dr. Frantzides had instituted collections actions against them; (2) harassed physicians who wished to refer patients to Dr. Frantzides; and (3) intentionally denied surgical privileges at NUH to Dr. Jacob Roberts, a surgeon associated with Dr. Frantzides. (*Id.* ¶ 24.)

Plaintiffs allege that at the time the Termination Agreement was executed, there were several outstanding accounts receivable arising out of Dr. Frantzides' services while he was associated with Faculty Practice. After the Termination Agreement took effect, Faculty Practice sent a number of Dr. Frantzides' patients to a collection agency—Defendant ICS. (*Id.* ¶ 28.) Plaintiffs claim that Faculty Practice "intentionally directed ICS to give patients the impression that Dr. Frantzides alone had retained ICS . . . [and] that Dr. Frantzides would receive the proceeds from whatever funds ICS collected." (*Id.* ¶ 28.) Approximately 600 collection notices were sent to Dr. Frantzides' patients. (*Id.* ¶ 36.) Plaintiffs claim that once these notices were distributed, Dr. Frantzides began receiving "dozens" of angry phone calls from patients accusing him of sending their accounts to a collection agency. (*Id.* ¶ 30.)

Concerned at the thought that he was identified as the beneficiary of the collection agencies' activities, Dr. Frantzides met with Harry Jones, Faculty Practice's Chief Compliance Officer, on February 6, 2007. (*Id.* ¶ 30.) Dr. Frantzides requested that Mr. Jones inform patients that Dr.

---

[2] Plaintiff does not reveal what prompted his severance from Faculty Practice.

3

Frantzides was not, in fact, receiving any of the collected funds and that Dr. Frantzides had not sent the patients to ICS. (*Id.*) Though Dr. Frantzides claims Jones appeared "receptive" to his concerns, three days later on February 9, 2007, Jones wrote to Dr. Frantzides, asserting that a change in the format of the collection letter, to identify Dr. Frantzides only as the "Provider" of services and Faculty Practice as the "Creditor," would be too confusing for patients to understand, and could result in reduced collections. (*Id.* ¶ 31.) Thus, Faculty Practice refused to distribute amended notices to correct what Dr. Frantzides believes is an error. (*Id.*) Dr. Frantzides alleges that as a result of this billing practice, his relationship with his patients has been damaged, leading to a reduction in patients seeking additional treatment from him and fewer word-of-mouth referrals. (*Id.* ¶ 37.)

On July 1, 2007, Mark Talamonti, M.D. was appointed Chairman of NUH's Department of Surgery. (*Id.* ¶ 38.) Plaintiffs claim that after being appointed Chairman, Dr. Talamonti began to discourage and intimidate NUH physicians from referring patients to Dr. Frantzides and CIMIS. Plaintiffs allege, for example, that in October 2007, when a Faculty Practice physician attempted to refer a patient to Dr. Frantzides for a laparoscopic bowel resection, Dr. Talamonti "castigated" the referring physician for making the recommendation.[3] According to Plaintiffs, Dr. Talamonti "threatened to use his power and position as Chairman of the Department of Surgery at NUH to 'investigate' the referring physician . . . ." (*Id.* ¶¶ 40-41.) Plaintiffs suggest that such intimidation of other physicians is a "common practice" of Dr. Talamonti, Faculty Practice and NUH as a whole, and the purpose of such conduct "has been to protect their power in the [laparoscopic services market] and increase their revenues . . . ." (*Id.* ¶ 42.)

Finally, Plaintiffs claim that sometime in June 2008, Dr. Frantzides contacted Dr. Talamonti to request "Professional Staff Privileges" at NUH for Dr. Jacob Roberts—Dr. Frantzides' Physician Assistant and new CIMIS surgeon. Dr. Talamonti declined this request on June 11, 2008, stating

---

[3] Neither party has provided the name of the referring NUH physician.

that Roberts did "not meet the minimum criteria to be a member of the [NUH] professional staff." (*Id.* ¶ 47.) On June 16, 2008, Dr. Frantzides wrote back, insisting that Dr. Roberts "be granted privileges of the 'Assistant' category as defined in Article 4, paragraph 4.2.6 of the [Faculty Practice] bylaws," and providing copies of the cited provisions.[4] (*Id.* ¶ 48.) Over the course of several weeks, Dr. Frantzides and Talamonti went back and forth about the issue until Dr. Talamonti finally told Dr. Roberts that he would not receive privileges at NUH due to Roberts' affiliation as a "fellow" with CIMIS. (*Id.* ¶ 51.) Plaintiffs further claim that once Dr. Frantzides put Dr. Talamonti on notice that he had violated NUH's bylaws by excluding Dr. Roberts, Dr. Talamonti later changed NUH's bylaws (but Plaintiffs do not explain when or how). (*Id.* ¶ 53.)

### III.     FTC Findings and Instant Complaint

In 2000, Evanston Northwestern Healthcare Corporation ("ENH") merged with Highland Park Hospital. (*Id.* ¶ 11.) As a result of the merger, on February 10, 2004, the Federal Trade Commission filed an administrative complaint alleging that ENH's acquisition of Highland Park Hospital violated § 7 of the Clayton Act because "it enabled ENH to raise its prices to private payors above the prices that hospitals would have charged absent the merger."[5] *In the Matter of Evanston Northwestern Healthcare Corp.*, 2007 WL 2286195, at *3 (Fed. Trade Comm'n. Aug. 6, 2007). The FTC also alleged that ENH engaged in price fixing on behalf of its physicians and other "affiliated physicians." *Id.* The case was assigned to an ALJ, who found that the merger transaction violated the Clayton Act and ordered ENH to divest Highland Park. *Id.* ENH appealed the ALJ's Initial Decision to the Commission, and rather than ordering divestiture, the Commission required ENH "to establish separate and independent negotiating teams" for its different hospitals in order to "re-inject" competition among managed care organizations. *Id.* at *79.

---

[4]     Copies of the cited provisions from the Faculty Practice bylaws are not in the record.

[5]     This count was later resolved by a consent agreement with the FTC in May 2005. *In the Matter of Evanston Northwestern Healthcare Corp.*, 2007 WL 2286195, at *3 (Fed. Trade Comm'n. Aug. 6, 2007).

Plaintiffs claim that the FTC's remedy "did not impair NUH's ability to exclude competitors." They note that in 2008, ENH changed its name to NUH, and NUH gained further monopoly power in 2009 when it acquired Rush North Shore Skokie Hospital. (Am. Compl. ¶¶ 11, 15.) Based on the above described factual allegations, Dr. Frantzides and CIMIS filed the instant complaint on March 5, 2010, alleging various Sherman Act violations, intentional interference with prospective economic advantage, civil conspiracy, and a violation of the Illinois Right to Publicity Act.

## ANALYSIS

Defendants move to dismiss Plaintiffs' complaint for failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6). In ruling on a 12(b)(6) motion, the court treats all well-pleaded allegations as true, and draws all reasonable inferences in Plaintiffs' favor. *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009). In order to survive a motion to dismiss, a plaintiff's complaint need not set forth detailed factual allegations, but it must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Thus, a plaintiff must "provide the 'grounds' of his 'entitlement to relief'" with "more than labels and conclusions," as a "formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

**I.      Counts I & II: Sherman Act Claims**

Plaintiffs allege that Defendants NUH and Faculty Practice violated 15 U.S.C. § 1 by entering into a "contract, combination or conspiracy" with ICS "to misrepresent that Dr. Frantzides [initiated] ICS' collection action." (Am. Compl. ¶ 58.) Plaintiffs further allege that "NUH has maintained a monopoly or attempted to monopolize the market for laparoscopic and other surgical services on the North Shore [of Chicago]" in violation of 15 U.S.C. § 2. (*Id.* ¶¶ 64-65.) Defendants, the medical providers as well as ICS, have move to dismiss these counts.

In order to state a claim under § 1 of the Sherman Act, Plaintiffs must plead facts suggesting that: (1) Defendants entered into a contract, combination, or conspiracy ("an agreement"); (2)

Plaintiffs suffered an accompanying antitrust injury; and (3) the contract, combination or conspiracy resulted in an unreasonable restraint of trade in the relevant market. *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 705 (7th Cir. 2011) (citing *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)). Under § 2 of the Sherman Act, Plaintiffs here must plead (1) that Defendants currently possess monopoly power in the relevant market and (2) that they willfully acquired that power; or (1) that Defendants had a specific intent to achieve monopoly power, (2) that they showed predatory or anticompetitive conduct directed at accomplishing their unlawful purpose, and (3) that there is a dangerous possibility that Defendants' attempt to monopolize will be successful. *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989) (citations omitted). Defendants argue that Plaintiffs' allegations are insufficient to establish the required elements of an antitrust claim under either provision of the Sherman Act, and the court agrees.

### A. Antitrust Conspiracy Under 15 U.S.C. § 1

Plaintiffs claim that Defendants Faculty Practice and NUH entered into a conspiracy with Defendant ICS to "malign" Dr. Frantzides and lower his reputation in the medical community. (Am. Compl. ¶ 58.) Plaintiffs specifically allege that after the execution of the parties' Termination Agreement, Faculty Practice conspired with ICS to give patients the impression that Dr. Frantzides had instituted collections actions against his patients. Plaintiffs provide no information about any agreement between Defendants, but simply state that "the fact that ICS conducted collections activities for another entity strongly suggests that ICS and NUH (or Faculty Practice) had an agreement." (Pls.' Resp. at 10.) The court is not persuaded that such "a bare assertion of conspiracy" accompanied by "a conclusory allegation of agreement at some unidentified point" is adequate to allege an unlawful restraint of trade. *See Twombly*, 550 U.S. 554 at 556-57. Even construing all of the facts in Plaintiffs' favor, their complaint does not include "enough factual matter" to suggest that an agreement was made between Faculty Practice, NUH and ICS. *Twombly*, 550

7

U.S. 554 at 556; *see also Tamburo v. Dworkin*, 601 F.3d 693, 699-700 (7th Cir. 2010) (finding no factual allegations suggesting the existence of an antitrust conspiracy); *Gupta v. St. Margaret Mercy Healthcare Centers, Inc.*, No. 2:95 CV 310, 1998 WL 34360626, *13 (N.D. Ind. April 22, 1998) (finding "no way" to conclude conspiracy existed when plaintiff-physicians failed to provide enough facts to show how defendant-hospitals acted together). As an aside, the court must also note the sheer facial implausibility of Plaintiffs' claims, given ICS' economic interests. As a collection agency, ICS has no obvious incentive to conspire with Faculty Practice or NUH to restrain Plaintiffs' practice. Plaintiffs are, after all, potential customers of ICS.

Even if Plaintiffs had pleaded facts sufficient to suggest that Defendants engaged in a conspiracy, Plaintiffs can survive this motion only if they also allege that they have suffered an antitrust injury resulting from "'acts that reduce output or raise prices to consumers.'" *Tri-Gen Inc. v. Int'l Union, Local 150, AFL-CIO*, 433 F.3d 1031, 1031 (7th Cir. 2006) (citing *Stamatakis Industries, Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992)). In this case, Plaintiffs allege that Defendants' conduct "interfered with [Dr. Frantzides'] current and future doctor/patient relationships so that patients in the market would disfavor Dr. Frantzides and instead seek treatment from Faculty Practice physicians." (Am. Compl. ¶ 58.) The court recognizes that Plaintiffs may, indeed, have suffered a loss to their medical practice business due to "competitive threat," but this loss does not constitute antitrust injury. "Transfer of business from one company to another . . . without an accompanying effect on competition, cannot be an antitrust violation" because "the antitrust laws . . . were enacted for 'the protection of competition, not competitors.'" *Tri-Gen Inc.*, 433 F.3d at 1031 (citing *Midwest Gas Servs., Inc. v. Ind. Gas Co.*, 317 F.3d 703, 711 (7th Cir. 2003)); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

Notably, Plaintiffs here have not alleged that any of Defendants' activities have resulted in any decrease in laparoscopic surgery services available to consumers. True, Plaintiffs appear to

8

believe that Defendants' actions have disparaged Dr. Frantzides' reputation with the result that they are less likely to do business with him. In Plaintiffs' view, consumers have thereby been deprived "of the benefits of Dr. Frantzides' surgical expertise and skill." (Am. Compl. ¶ 58.) Yet "[s]o long as these patients were treated by another qualified physician, there has only been a reduction in suppliers, not in the output of patient care." *Wagner v. Magellan Health Servs., Inc.*, 121 F. Supp. 2d 673, 681-82 (N.D. Ill. 2000) (finding plaintiff failed to allege an "actual injury to competition" where he had not alleged "any change in the price of emergency psychiatric services, nor alleged that consumers faced less of a market choice."). In this case, Dr. Frantzides retains surgical privileges at NUH and patients remain free to use his services if they choose to do so; Plaintiffs' have not alleged an actual decrease in laparoscopic surgery services to consumers.

The court concludes that Plaintiffs have failed to allege that Defendants entered into an unlawful agreement and have offered no basis for a conclusion that they suffered an antitrust injury under § 1 of the Sherman Act.

**B.    Monopolization Under 15 U.S.C. § 2**

Plaintiffs claim that Defendants[6] also violated the prohibition against monopolization and attempted monopolization under § 2 of the Sherman Act. Plaintiffs specifically allege that NUH has enjoyed "substantial market power in the market for hospital services," including laparoscopic surgical services, and NUH sought to eliminate competition in the market by restraining Plaintiffs from servicing patients. (Am. Compl. ¶¶ 63, 65.) Yet none of Plaintiffs' specific allegations regarding NUH's alleged attempt to monopolize the market—(1) directing ICS to send misleading collection letters; (2) discouraging referrals to Dr. Frantzides and CIMIS, and (3) refusing to grant privileges to Dr. Jacob Roberts (Dr. Frantzides's employee)—bear any relation to Defendants' current possession or potential attainment of monopoly power.

Defendants contend that Plaintiffs have also not properly alleged that Defendants possess

---

[6]    Plaintiffs bring Count II against only Defendants NUH and Faculty Practice.

market power in a relevant market. The court agrees with Defendants that Plaintiffs' complaint fails to define the relevant geographic and product market at issue with exact specificity. Plaintiffs refer to the geographic market as both the "North Shore" [of Chicago] and beyond Illinois; Plaintiffs describe the product market as both hospital-based surgical services generally, and laparoscopic surgical services in particular. (Am. Compl. ¶¶ 9-10, 65; *Id.* ¶¶ 10, 59, 63.) But more importantly, Plaintiffs' complaint has not alleged how Defendants actually possess market power. In *42nd Parallel North v. E Street Denim Co.*, 286 F.3d 401 (7th Cir. 2002), 42nd (a causal clothing store) sued E Street (its competitor), alleging that E Street intimidated certain clothing manufacturers from filling 42nd's merchandise orders. *Id.* at 403. 42nd argued that "market power is inferable from the fact that E Street raised its prices for the products after coercing the manufacturers" (*id.* at 405), but the Seventh Circuit disagreed, explaining that "[t]he key inquiry in a market power analysis is whether the defendant has the 'ability to raise prices without losing business.'" *Id.* at 405-06 (quoting *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 668 (7th Cir. 1987)). In this case, Plaintiffs have made no such allegations regarding Defendants' ability to raise prices, other than to briefly state that, "in the past," Defendants' exercised their market power by "raising prices charged to managed care companies to supra-competitive levels." (Am. Compl. ¶ 63.) In any event, as the Seventh Circuit noted in *42nd Parallel North*, "just because [prices are raised] doesn't mean competition has been harmed." *42nd Parallel North*, 286 F.3d at 405.

Moreover, Plaintiffs' allegations regarding Defendants' ability to raise its rates rest almost exclusively on that FTC ruling, *In the Matter of Evanston Northwestern Healthcare Corp.* Plaintiffs' reliance on that ruling is misplaced for a number of reasons. First, the FTC determination concerned acute inpatient hospital services, whereas Dr. Frantzides performs outpatient laparoscopic surgery. Second, Plaintiffs have made no allegations regarding an increase in pricing of laparoscopic services due to Defendants' actions. Finally, Plaintiffs complain that the FTC's remedy did not impair NUH's ability to exclude competitors, but that was not its goal; it was meant

to establish separating negotiating teams to ensure that pricing among managed care organizations remained competitive—not competition among laparoscopic surgery service providers. Again, Plaintiffs appear primarily concerned with their elimination as a competitor in the laparoscopic surgery market, but have not adequately pleaded that Defendants possess market power in a relevant market.

The court therefore concludes that Plaintiffs have failed to state a claim under § 2 of the Sherman Act.

**C.     State Common Law Claims**

Counts III-V of Plaintiffs' Amended Complaint raise state common law claims of conspiracy, tortious interference with prospective economic advantage, and a violation of the Illinois Right of Publicity Act. Having dismissed Plaintiffs' federal claims, the court also dismisses Plaintiffs' remaining state law claims without prejudice. *See Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 300 (7th Cir. 2003).

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss [42, 46] are granted and all claims are dismissed without prejudice. Plaintiffs have leave to file an amended complaint within 21 days, but the court cautions that in order to state a claim under the antitrust laws, any such complaint must include sufficient allegations to raise an antitrust injury.

ENTER:

Dated: March 30, 2011

_____
REBECCA R. PALLMEYER
United States District Judge